### THE PEOPLE vs. WALKER and others, Trustees of the Bank of Utica.

After a notice has been given, by the comptroller, to a bank subject to the provisions of the safety fund act, that the safety fund has been reduced below the sum required in the 4th section of that act, and that such bank is required to pay to the treasurer of the state, on or before the first day of January then next, one half of one per cent on its capital stock, that sum will *continue* payable, each year, until the safety fund shall be reimbursed, without any subsequent notice or designation. An annual notice from the comptroller is not necessary.

And where the charter of a bank expired on the 31st day of December, 1849; *it was held*, that it was liable, notwithstanding, for the payment due for the year ending on the 31st of December, 1849.

*Held, further*, that an action would lie against the trustees of the bank, for the recovery of that sum, in the name of the people, the state being the trustee of the entire bank fund, for the benefit of all persons having claims upon it.

The payment required to be made by a bank, on or before the 1st of January in each year, if made previous to the 1st of January, is for the current year; if made after the first of January, it is for the preceding year. And the conduct of a bank, in making eight successive annual payments, will be regarded as putting a practical construction on the law, by the bank, in respect to the time when the payments are due.

THIS suit was brought to compel the Bank of Utica to contribute to the safety fund, as required by the statute regulating such contributions. The complaint alleged the due incorporation of the Bank of Utica by an act of the legislature passed June 12, 1812. That the bank was organized and entered upon the exercise of its corporate rights as a bank with a capital of $600,000. That on the 22d day of April, 1829, another act was passed extending the charter of the Bank of Utica, and by virtue thereof the bank continued to exercise banking powers during the continuance of its charter under said act. That by the act of April 22d, 1829, the said bank was made subject to all the provisions of the "act to create a fund for the benefit of the creditors of certain moneyed corporations, and for other purposes," passed April 2d, 1829; and pursuant to the act extending its charter, the bank filed with the comptroller a written consent to become subject to all the provisions of the act extending its charter, and it was thereupon extended

The People *v.* Walker.

for the term in said act specified, to wit, until the 1st day of January, 1850. The complaint further alleged that the charter of the Bank of Utica expired January 1st, 1850, and at that time the defendants were its directors, and became trustees under the statute, and that assets to over $600,000 came to their hands, and sufficient to pay all the debts of the corporation. The complaint further averred that the bank fund, created and provided for by the act of April 2d, 1829, and the several acts amending the same, became and was impaired and reduced below the sum required to be paid to the treasurer of the state, by the 4th section of said act, on or before January 1st, 1842, by the payment of the debts of insolvent corporations, as provided in the act of April 2d, 1829, and had ever since been and was still so impaired. That due notice thereof was given to said Bank of Utica on or before October 11, 1841, and that said bank was required to pay to the treasurer of the state, the sum of one half of one per cent upon its capital stock aforesaid, annually thereafter, to reimburse said fund, as contemplated and required by the 8th section of the act of April 2d, 1829, and said payments had been and were still required annually, to reimburse said fund; the same being still impaired and reduced below the sum required by the 4th section of the act of April 2d, 1829. The complaint then averred, that by reason of the impaired condition of the bank fund and the notice from the comptroller and the several statutes relating thereto, the Bank of Utica, and the defendants as its trustees, became liable to pay on the 1st of January, 1850, to the treasurer of the state of New York, the sum of $3000, being a sum equal to one half of one per cent upon the capital stock of said bank, liable to be taxed pursuant to the provisions of said statutes. It was further alleged that on the 3d day of December, 1830, and annually down to and including 1848, the said bank had paid annually the one half of one per cent, and that it was liable to pay said $3000 on the 31st day of December, A. D. 1849, and had failed to do so; and judgment was demanded for $3000 and interest from January 1st, 1850.

The answer of the defendants admitted the original incorpo-

ration of the Bank of Utica in 1812. That after January 3d, 1831, the bank had capital actually paid in to the amount of $600,000. That by act of April 22d, 1829, the original charter was extended, " until the 1st day. of January, 1850," and that on or before January 4th, 1830, the said corporation filed a consent to become subject to the provisions of the act extending said charter, to wit, subject to the provisions of the safety fund law. The answer denied that the charter of the bank expired on 1st of January, 1850, but averred that the same expired on the 31st day of December, 1849, and not afterwards. That the corporation ceased to do business after the 31st of December, 1849, and on the 1st of January, 1850, the defendants, as trustees, came into full possession of all the assets of the bank, and that the assets were sufficient to pay all the debts of the corporation. It admitted that the bank after the filing of its consent to the act extending its charter, did every year, on or about January 1st, pay one half of one per cent upon its capital stock, until it had paid a sum equal to 3 per cent upon its capital, and that the last of such payments was made about January 1st, 1837. The answer admitted that on the 11th day of October, 1841, the comptroller designated and made known to the said bank, that the sum of one half of one per cent on its capital was required to be paid to the state treasurer on or before January 1st then next, in consequence of the safety fund being impaired and reduced; and that said bank did, on about January, 1842, and in each of the years 1843, 1844, 1845, 1846 and 1847, pay the treasurer the one half of one per cent, making of said last payments another aggregate of three per cent on said capital stock, and that afterwards, and about January 1, 1848 or 1849, the said bank paid one half of one per cent on said capital in each of said years. And that no other designation was made by the comptroller than on the 11th day of October, 1841. And the answer denied that the bank was indebted or liable to pay the $3000 demanded, or to contribute anything more to the safety fund, and demanded judgment in their favor.

Upon the above issues, the cause came on for trial at the Albany circuit, before his honor, Mr. Justice SHANKLAND, and a

jury. On the trial the plaintiffs gave evidence, showing that the Bank of Utica had, at different times between December 31, 1834, and March 2, 1837, contributed $18,000 to the safety fund, which was equal to three per cent upon its capital of $600,000. Also that it contributed to the same object $3000 per annum for the year 1841, and for every year thereafter to 1848, inclusive. The payment for 1848, being made December 30th. The plaintiff also proved a circular of the comptroller to the safety fund banks, dated October 11, 1841, requiring the payment of one half of one per cent upon the capital, on or before the 1st day of January then next. The plaintiffs also gave in evidence a statement showing the number of banks operating under the safety fund, the time when their charters were to expire, and the amount contributed by each to the safety fund. The plaintiffs also gave evidence of the condition of the bank fund, showing the debt to amount, September 30, 1840, to $673,364.40. The plaintiffs proved that the bank fund had been impaired since 1840 or 1841. The evidence being closed, the counsel for the defendants claimed that the action could not be maintained, because, 1st. That on the first day of January, 1850, when it was claimed the contribution from the Bank of Utica was payable, there was no such corporation as the Bank of Utica in existence, its charter having expired on the 31st December, 1849. Second. That the comptroller did not on or before January 1st, 1850, designate any sum to be paid by the Bank of Utica to the bank fund, pursuant to the 8th section of the safety fund act. And that the acts relating to banks, subject to the safety fund of May 20, 1841, and April 12, 1842, were not passed by a constitutional majority, and that no notice had been given by the comptroller that the safety fund was impaired, or that any payment was required, subsequent to October, 1841. Third. That the act creating the bank fund had provided a remedy against delinquent banks, by a forfeiture of their charters for non-payment, which remedy was exclusive. Fourth. That the liability, claimed in the complaint, was not a debt due the state for which an action in the name of the people would lie. The justice decided that the action could not be maintain-

ed, and directed the jury to find for the defendants, and the plaintiffs excepted, and the exceptions were sent for argument, to the general term in the first instance, and upon them the people asked for a new trial.

*Ogden Hoffman,* (Atty. Gen.,) and *John H. Reynolds,* for the people. I: The Bank of Utica was chartered in 1812, to continue until the 1st day of June, 1832. (*Laws of* 1812, *p.* 397.) In 1829, the charter was extended "until the first day of January, one thousand eight hundred and fifty," (*Laws of* 1829, *p.* 340 ;) except so much as is repugnant to the "act to create a fund for the benefit of the creditors of certain moneyed corporations," and the second section subjects the bank to the operation of the safety fund act. Section 6 declares that "the charter of the said corporation shall not be extended by this act unless the corporation shall on or before the first day of January next, cause to be filed with the comptroller of this state a certificate under its corporate seal, and signed by its president and cashier, setting forth that said corporation assents to become subject to the provisions of this act." This certificate was filed. By section 2 of the act of 1829, (*Laws of* 1829, *p.* 166,) "Every corporation shall on or before the first day of January in every year pay to the treasurer of this state a sum equal to one half of one per cent on the capital stock of such corporation paid in, after excepting therefrom such part of the capital stock as is held by the state, and at that rate for the time such corporation shall have been in operation, if less than one year." By section 4, of this act, the payments were to continue until 3 per cent was paid in. By section 8, it is provided that whenever the fund created by the act shall be reduced below the sum as provided in the 4th section, the corporations existing and to be created shall, on or before the first day of January, in every year thereafter, pay to the treasurer of this state, such sum to be designated by the comptroller, not exceeding a sum equal to one half of one per cent on its capital stock, as hereinbefore provided, "which last mentioned payments shall continue to be made by every corporation subject to the operation of this act,

The People *v.* Walker.

until such sum shall be reimbursed, and made to amount to the sum as provided in the fourth section, after which such annual payments shall be suspended," &c. (*Laws of* 1841, *p.* 280, § 5. *Id. p.* 337. *Laws of* 1842, *p.* 306.) By these several acts the Bank of Utica became liable to pay all sums required of it by statute, or upon the notice of the comptroller, to replenish the bank fund, or to keep it to the amount required by the fourth section of the act of 1829.

II. When the bank accepted the act extending its charter to January, 1850, it took the benefits with all the conditions attached. It thus amounted to a contract with the government, to be performed by the bank, to pay the "safety fund" according to the statutes creating that fund, and replenishing it when impaired. (*Angell & Ames on Corporations,* 27. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 636.)

III. The bank has recognized this obligation. (1.) By filing the certificates required of it by the act extending its charter. (2.) By paying the amount required, up to the 3 per cent, from 1830 to 1837. (3.) By paying from 1842 to 1849, to reimburse the fund, upon the notice of the comptroller.

IV. The obligation to pay, for the purpose of reimbursing the fund, as required by the comptroller under section 8 of the act of 1829, is not limited to the 3 per cent on its capital stock, but is to continue annually as long as the fund continues impaired below the amount specified in the 4th section of the act, and to the same effect are the statutes of 1841 and 1842. The fund has been impaired ever since 1840, and the obligation to pay continued in force. And under the act of 1842, no notice or designation by the comptroller was required; but the payments were to continue until the fund was sufficient to discharge all its existing liabilities. This act was passed, after the notice given by comptroller under the previous acts. And if the notice was required, the notice given of the fact that the fund was impaired, and that one half of one per cent must be paid was sufficient, and thereafter the statute made it the duty of the bank to continue the annual payment, until the fund was made equal in amount to that required, and this has never since been

the fact. And the bank has recognized its liability, by continuing the payments from year to year, up to and including the year 1848.

V. It is clear, from the mode of payment adopted by the bank, and from the statutes of 1829 and 1841 and 1842, that the bank not only did not pay, but could not be required to pay until the *end* or expiration of the year, and that none of the payments made were pre-payments, or so regarded by the bank or the comptroller. The last payment was made December 30th, 1848, and was in terms for the year 1848. (*See Laws of* 1829, §§ 2, 4, 8, 13, *p.* 167.)

VI. The obligation to pay, rests in contract, and is as binding as a note or any written instrument made by the bank. It was an obligation or duty to pay every year; and the payment being made, discharged the obligation for the preceding year, and so far as the obligation related to the payment of the money, it did not expire with the year or with the charter of the bank, but continued like any other obligation, until discharged by payment from the funds of the corporation.

The duty to pay was a part of the charter, and the promise to perform the duty was a condition precedent to the exercise of the corporate powers granted, and the consideration for such grant of power. But it is enough that the law imposed the duty; for "all duties imposed on corporations by law, raise an implied promise of performance." (2 *R. S.* 3d *ed.* 568, § 105. 1 *id.* 732, 3, §§ 9, 10. *Laws of* 1829, *p.* 340, § 1. 4 *id. p.* 167, § 2. *Kortright* v. *Com. Bank of Buffalo*, 20 *Wend.* 94. 7 *Cranch*, 299. 2 *Kent*, 289. 8 *Wheat.* 338.)

VII. The language of the act extending the charter is, "until the first day of January, 1850." Hence the charter could not expire *until* that day, and *on* that day the payment became due. If we adopt the usual mode of computing time in legal proceedings, the first day of January would be *included.* But if no such general rule applies to such a case, then, in this, as in other similar cases, the rule must depend on the reason of the thing, according to the circumstances. (*Lester* v. *Garland,* 12 *Vesey, jr.,* 248.) And if the money was due when the char-

The People *v.* Walker.

ter expired, or became due at the very moment of its expiration, as it must necessarily have done, then there is no question of time in the case.

VIII. Where there is nothing else to guide the construction, that prevails which is most beneficial to him in whose favor the obligation rests. (*Lysle* v. *Williams*, 15 *Serg. & R.* 135. *Donaldson* v. *Smith*, 1 *Ashm.* 197. 4 *Kent*, 95, 5th ed. *Id.* 161. *Story on Bills*, § 339. *Cartle* v. *Burditt*, 3 *T. R.* 623. *Bigelow* v. *Willson*, 1 *Pick.* 485. *Presbey* v. *Williams*, 15 *Mass.* 193.)

IX. The provision in the 28th section of the act of 1829, authorizing proceedings against a bank, upon failure to pay its contribution to the fund and for other causes, is merely a cumulative remedy, and does not exclude the right of recovery for the amount due, and such action is properly brought in the name of the people.

Upon the case shown at the circuit, the people were entitled to recover, and a new trial should be granted.

*J. C. Spencer*, for the defendants. I. No action can be maintained by or in the name of the people of the state to recover the assessment or contribution claimed in this action. It was not a debt due to the state, in its corporate or political capacity. By sections 5, 6 and 7 of the safety fund act, (1 *R. S.* 737, 3*d ed.*) the money contributed is declared the property of the corporations contributing, the income is to be paid to them, and accounts of the fund are to be kept distinct from the funds of the state. The state has no interest in the fund. The attorney general is to bring those actions only, in the event of which the people of the state are interested. (1 *R. S.* 188, *ch.* 8, *tit.* 5, *part* 1, 3*d ed.*) By § 111 of the code, every action must be brought in the name of the real party in interest, except as provided in § 113, which authorizes trustees of an express trust to maintain one. The state has not assumed any of the obligations of a trustee, and is not liable for the misfeasance or negligence of the agents employed. The money is to be paid to the treasurer, and he is more properly the trustee for the contributing

The People v. Walker.

banks.    A public agent has authority to sue, co-extensive with
his duties, whether expressly authorized by statute, or not.
(*Overseers of Pittstown*, v. *Plattsburgh*, 15 *John.* 436.  18 *id.*
407.    *Bronson, J. in Supervisors of Galway* v. *Stimpson,*
4 *Hill,* 106.)   The state has made no contract with the banks
for the benefit of another, because there is no contract whatev-
er in relation to these moneys.   The law has enjoined a duty
and prescribed conditions for the enjoyment of a franchise.   It
has entered into no obligation which would constitute a consid-
eration for a contract.                                        *6*

II.  The statute creates a new duty and obligation, and by
section 28 provides a mode of remedy for the enforcement of
the obligation.   This mode of remedy is exclusive, and no other
can be had.   Where a statute creates the right and gives the
remedy, that is exclusive.  (5 *Mass. Rep.* 514.   *Hinsdale* v.
*Learned,* 16 *id.* 65, 76.   *Stafford* v. *Ingersol,* 3 *Hill,* 38, *per
Bronson, J. Almy* v. *Harris,* 5 *John.* 175.   *McKeon* v.
*Caherty,* 3 *Wend.* 494.   *Calking* v. *Baldwin,* 4 *id.* 667.
3 *Comst.* 15.)  No action at law or proceeding in equity can be
maintained to enforce the payment of a tax on personal estate.
(*Durant* v. *Supervisors of Albany,* 26 *Wend.* 66, 90, 91, 107,
108.)   The bill was filed on the ground that there was no remedy
at law, and that there was no other mode of collecting the tax.
And in consequence of this decision, the act (*ch.* 318 *of* 1842)
was passed.  (1 *R. S.* 452.)   No action can be maintained to
compel the payment of state, county or town taxes, except
where expressly given.   The same rule applies to assessments
for common benefits.  (*Ch. J. Parsons, in Andover Turnpike*
v. *Gould,* 6 *Mass. R.* 44.

III.  If the bank was bound to contribute on the 1st day of
January, 1850, no liability to pay was created, according to the
provisions of the statute.   By section 8 of the safety fund
act, (*ch.* 94 *of* 1829) and by § 5 of ch. 202, of 1841, (1 *R. S.*
738, 744, 745.   1 *R. S.* 3*d ed.*) the banks are to pay in each
year, a sum (not sums) to be designated by the comptroller,
not exceeding one half of one per cent of their capital, which
payments are to be made until the fund be reimbursed, when the

The People *v.* Walker.

annual payment is to cease, until it again becomes necessary. And by § 5, of ch. 202 of 1841, they are to pay such sum of money as may be required by the comptroller. The designation of the amount, and the requirement to pay it, in each year, are conditions precedent to the liability to pay, and these were conditions precedent to the liability to pay in January, 1850. There was no notice to the Bank of Utica of any sum having been designated, or of the bank being required to pay it, in 1849 or 1850. Nor any notice or demand other than that in paper " B" to pay on the 1st of January, 1842. It was a special notice and did not "require" any payment after 1842. It was a duty to be performed on demand, and demand was indispensable; as in sales of lands for taxes. (*Jackson* v. *Shepard,* 7 *Cowen,* 88. 7 *Wend.* 48. 15 *id.* 348. 16 *id.* 550. 5 *Hill,* 285. 2 *Barbour,* 360. *Beekman* v. *Bigham,* 1 *Seld.* 366.) On the general principle that the notice and designation were conditions precedent, *see Hardres,* 42; 1 *Chit. Plead.* 320; *Comyn's Dig. Pleader, C* 73; *Clough* v. *Hoffman,* 5 *Wend.* 499; *Leffingwell* v. *White,* 1 *John. Cas.* 99; *Com. Dig. Condition, L.*

IV. If the notice and designation can be construed as requiring payment from the bank on the 1st day of January, 1850, still the bank was not liable to pay the contribution. (1.) The statutes before cited enjoin this duty of payment on corporations existing at the time the payment is to be made. (2.) The Bank of Utica was not a corporation on the first of January, 1850, its charter having expired on the 31st of December, 1849. Its charter was continued until the 1st day of January, 1850. (*Laws of* 1829, *ch.* 216, *p.* 340.) (3.) Being an act conferring corporate powers and franchises, it is to be construed strictly, and so as to' limit to the utmost the granted powers. (*The Stourbridge Canal* v. *Wheeley,* 2 *Barn. & Adol.* 792. *Webb* v. *Manchester Railway Co.* 1 *Railway Cas.* 576. *Dwar. on Stat.* 648, 649, *ed. of* 1848. *Beatty* v. *Lessee of Knowles,* 4 *Peters,* 168. *Cayuga Bridge Co.* v. *Magee,* 2 *Paige,* 116, 119.) If the bank claimed to exercise corporate powers on the 1st of January, 1850, this rule would prevent it; and being

The People *v.* Walker.

once established, it must prevail whether a benefit or disadvantage be the consequence. (4.) The word "until" a given day, without any thing in the same act or instrument to control its meaning, is exclusive of the day named. Webster's definition of *till,* which he says is the same as *until;* it is from the Saxon; to reach or come to. The examples he gives, show that it is ordinarily exclusive. *Baswick's case,* (5 *Co.* 94,) decides that the primary sense of *a, ab,* or *from,* and *usque* or until, is exclusive; *a,* or *ab,* signifying the first terminus from which, and *usque,* the first terminus *to which.* *Nichols* v. *Ramsdel,* (2 *Mod.* 280,) held that a release of all demands till the 26th of April did not include a bond dated that day, and that the word *usque,* or until, was exclusive. The word *from* is also exclusive. (*Ex parte Dean,* 2 *Cowen,* 605. *Homan* v. *Liswell,* 6 *id.* 659.) Where letters patent were granted for the term of fourteen years, dated 26th February, 1825, held that the term expired 25th of February, 1839. (*Russell* v. *Ledsam,* 14 *Mees. & Wels.* 574. *Same case,* 9 *Jurist,* 557.) Upon an act of parliament for constructing a road from a given place to the town of Hastings, held that that town was excluded. (*Hammond* v. *Brewer,* 1 *Bur.* 376. *Same construction in Latch,* 185, *as stated by J. Grose in* 3 *Term Rep.* 515.) Same construction given to an indictment which stated a road to lead to Gamlingary. (3 *Term Rep.* 513, 515.) In the case of *The King* v. *Agnew,* (5 *East,* 244,) it was held that as the meaning of the word *until* was not necessarily so fixed by common usage as to be incapable of qualification, the court would look to the context to see in what sense it was used in the indictment, and with the view to support it. That rule is inapplicable here, because there is nothing in the context to indicate the sense of the framers. We are therefore to recur to the natural meaning, which we have shown to be exclusive. The constitution of 1822 furnishes strong illustrations of the word "until." (*Art.* 1, § 16. *Art.* 9, § 1.) So does the constitution of 1846. (*Art.* 14, § 6, *and* § 11.) In the following cases the word *inclusive* is added, to qualify *until,* (*Art.* 14, §§ 1, 2. *In the Judiciary act of* 1847, *p.* 319, *&c. p.* 320,

§ 6; 331, § 40; 338, § 66; 339, § 67.) As to the poor law settlement cases in England, the rule was for a long time fluctuating, and was at length settled from the view taken of the policy of the law, and in order to complete the hiring for a year. Ashurst, J. says in *The King* v. *Skiplam*, (1 *Term Rep.* 490,) that whatever the last determination is, in those cases, it should be adhered to. We maintain that there being nothing in the act to control the natural meaning of the word, it should be applied in its natural sense, and that the only rule applicable to this peculiar case is that already given, that the act is to be construed so as to limit the powers of the corporation. (5,) But there are considerations arising upon the statute, to show that the word until should be regarded as exclusive. It is to be presumed that it was intended the charter should end with the ordinary year, and not last only a day over. Assuming that the notice required the payments annually, in each year, as averred in the complaint, which it did not, the bank complied with it, for it paid on the 5th of January, and on the 30th of December, 1848, as and for the 1st of January, 1849, and therefore paid for the current year, 1849. By the second section of the safety fund act, the primary contributions of one half per cent which were to be absolutely paid on the 1st of January, were retrospective; as is shown by the provision that the banks were to pay at that rate for the time they had been in operation, if less than one year. But the eighth section of the safety fund act and the act of 1841, are obviously prospective; for the payments are to be made in every year thereafter—after the designation and requirement by the comptroller. And it was evidently to be made for the current year in which it was made. So that if the charter of the bank had been to continue until the 1st of January, 1843, the payment made on the 1st of January, 1842, was a compliance with the statute in making the payment for the current year. It would be gross injustice to require contributions from a bank that had terminated its business, and could derive no benefit from the fund.

The People *v.* Walker.

*By the Court,* GOULD, J. The three points presented for decision in this case are, as claimed by the defense, 1st. The state is not a proper party plaintiff, nor can the people sue for this claim, if it exist. 2d. There has not been for the period claimed as the one for which the last payment is due, any *demand* by the comptroller, or *notice given,* or any designation that the payment sued for was required to be made. 3d. The payments in each year, were for the current not the *past* year; and the one-half of one per cent for the year 1849, has been *actually paid,* by the second payment of 1848, made December 30th, 1848.

On the first point, the court are of opinion that by the whole act providing for the creation of a safety fund, and by all the subsequent provisions, in different statutes, relating to it, the state has taken on itself by and through its public officers, such duties, and has such powers, as make it, in law, trustee of the whole fund, for the benefit of all who may have claims on it. By the law of 1829, (the original safety fund act) section 2, the payments to create this fund, were to be made "*to the treasurer of this state.*" By section 5 (same act) "the comptroller and treasurer of this state were to keep the accounts of the fund;" and the comptroller to "report to the legislature the condition thereof." And though by section 6, the fund "shall be the *property* of the corporations" paying it in, this section gives to the comptroller the power to invest it, as a trustee would; and the subsequent sections *qualify* this *property* very essentially. By section 7, the income (when the fund remains full the income is not required, &c.) is to be paid to such corporations, "by the comptroller." By section 8, whenever the fund is impaired, the *comptroller* is to direct what sum, (within the prescribed limit) shall be paid "*to the treasurer of this state,*" till the fund be reimbursed.

Whenever the creditors of any insolvent bank shall be entitled to receive payment from the fund, section 10 makes it the duty of the *comptroller to draw on the treasurer* for the requisite sum, not exceeding the bank *fund,* (i. e. the trust fund.) And by section 12, the moneys so paid, "*out of the treasury*"

*shall be a charge upon the fund.* By section 13 (the fund remaining good,) any corporation, on its charter's ceasing, is to receive its share from the *comptroller.* The comptroller and treasurer continued to be the officers authorized to receive and pay all moneys of this fund, until by the law of 1845, (*Chap.* 114, § 2,) the comptroller was authorized to issue *state stock* " sufficient to discharge all the debts of the *safety fund banks which have suspended payment :*" an amount which it is notorious, will never be more than reimbursed by the payments to be made, as long as the safety fund act remains applicable to any bank that was ever under it. And this state stock has been issued.

If these acts—this assuming of the liability to collect and pay, this being the *only* power to collect, invest and pay—do not constitute the state *the proper,* and the *only* proper, party plaintiff, it is difficult to say what would.

II. As to the *demand,* or *notice,* or *designation of amount to be paid.* 1st. The fund (as sufficiently *declared* by the law of 1841, chap. 292,) had become, in the words of the 8th section of the original act (of 1829,) " reduced below the sum provided in the fourth section of this act," and so under that 8th section without the law of either 1841 or 1842, this bank became liable to pay to the treasurer, " on or before the first day of January *in every year thereafter,* such sum to be designated by the comptroller, not exceeding a sum equal to one half of one per cent on its capital stock; which last mentioned annual payment shall continue to be made *until the aforesaid fund shall be reimbursed,* &c. (See the residue of that section.)

Under the law of 1841. (*Laws of* 1841, *p.* 280,) which is really but a substantial repetition (in this respect) of that of 1829, the comptroller gave the notice of, required the payment of, or " designated," (whichever the defendants please,) the sum of " one half of one per cent of its capital stock," as the sum which the Bank of Utica was to pay, " on or before the first day of January next, pursuant to the provisions of the act" &c., (referring to said act of 1841, *which refers to the act of* 1829, and, as to *the substance of this provision, is identical with it,*)

which sum, *once* " designated" was *to continue* to be paid annually "*until the aforesaid fund shall be reimbursed*," &c., by *both* acts, of 1829 and of 1841. And under either act no *annual* designation was required. And the law of 1842, (*Laws of* 1842, *p.* 306, § 1,) considering this designation fully made under the law of 1829, merely provides (on this point) that such annual payments "*shall continue until*" &c., as in the law of 1829. The objection then to the law of 1841, that it was not passed by the two-thirds vote required, falls; because, it is really but a *declaratory* act, stating what should establish, the *fact* that the fund *had* become reduced; and then merely repeating (in its 5th section) the provision of the former act; and the act does not "alter or impair" the rights, &c. of a corporation, and needs no *two-thirds* vote. And the same may be said of the law of 1842, which finding it *declared* by law, that the fund had become reduced, does not substantially vary the provisions of the law of 1829.

2d. But the conduct of the Bank of Utica, in making *eight* successive payments, continuing down to December, 1848, puts a *practical construction* on the law. Had that bank *not* paid, it is highly probable it might have heard from the comptroller, in the way of " designation " or demand. This point is but a mere afterthought.

III. But it is claimed that these payments were, in each year, made in advance, if before January 1st, or if after January 1st, *then for the current year ;* i. e. on the 1st day of January, 1848, or at any later day in 1848, the payment was for the year ending December 31st, 1848. There are no proofs in the case, by which to pass on this, as a matter of fact, as there probably might have been. But "on or before the first day of January in each year," must mean that the payment may be made any *indefinite* time, no matter how long *before*, January 1st. Suppose it made the first of December, would any one suppose, then, that it was made for the year *to commence* 30 *days thereafter*, for the *next* year ? And does not the use of the words, " on or before " a particular day, necessarily imply that the *ground*, or *cause* of payment, the *consideration* or indebtedness,

The People *v.* Walker.

was, prior to the limit, complete? Again; the second section of the act of 1829 says, " such corporation shall, on or before the first day of January in every year, pay to the treasurer of this state a sum equal to one half of one per cent on the capital stock paid in, &c. *And at that rate for the time such corporation shall have been* in operation, if *less than* one *year.*"

This surely ends all doubt on this point. A bank going into operation the first of July, 1835, pays, " on or before the first day of January, 1836," one *quarter* of one per cent, for the time (of the *past* year) that it *has been* in operation. If the bank fail to pay, on or before January 1st, but pays February 1st, it is still for the *past* year. It is not deemed necessary to go into a discussion of the point taken, that the *forfeiture of the charter*, for non-payment, is an exclusive remedy. If the last point be correctly decided, the " *exclusive remedy*" would always, for the *last* year (or part of a year) of every bank's existence, be of *difficult application ;* so difficult, that no such absurdity will be here held to be law. And as to the non-existence of the Bank of Utica on the first day of January, 1850, if the payment were due for the year ending December 31st, 1849, the bank, or its trustees, with its funds, will probably be where they can be found, to pay the amount of the recovery, as they have been found to defend the suit.

A new trial must be ordered.

[ALBANY GENERAL TERM, March 3, 1856. *Harris, Watson* and *Gould,* Justices.]